

**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

| | |
|---|---|
| Robert C. Byrd United States Courthouse | *Mailing Address* |
| 300 Virginia Street, East | Post Office Box 1713 |
| Suite 4000 | Charleston, WV 25326 |
| Charleston, WV 25301 | 304-345-2200 |
| 1-800-659-8726 | FAX: 304-347-5104 |

FEB 2 8 2013

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

February 25, 2013

Michael R. Whitt, Esquire
The Law Office of Michael R. Whitt
810 North Jefferson Street, Suite 107
Lewisburg, WV 24901

      Re: United States v. David C. Hughart

Dear Mr. Whitt:

This will confirm our conversations with regard to your client, David C. Hughart (hereinafter "Mr. Hughart"). As a result of these conversations, it is agreed by and between the United States and Mr. Hughart as follows:

1. **CHARGING AGREEMENT.** Mr. Hughart agrees to waive his right pursuant to Rule 7 of the Federal Rules of Criminal Procedure to be charged by indictment and will consent to the filing of a two-count Information to be filed in the United States District Court for the Southern District of West Virginia, a copy of which is attached hereto as Plea Agreement Exhibit A.

2. **RESOLUTION OF CHARGES.** Mr. Hughart will plead guilty to Count One of said Information, which charges him with a violation of 18 U.S.C. § 371 (conspiracy to defraud the United States), and to Count Two of said Information, which charges him with a violation of 18 U.S.C. § 371 and 30 U.S.C. § 820(c) (conspiracy concerning mandatory mine health and safety standards).

3. **MAXIMUM POTENTIAL PENALTY.** The maximum penalty to which Mr. Hughart will be exposed by virtue of this guilty plea is as follows:

 

_____
Defendant's
initials

Michael R. Whitt, Esquire
February 25, 2013                    Re: David C. Hughart
Page 2

    (a)   Imprisonment for a period of six years;

    (b)   A fine of $350,000, or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from defendant's conduct, whichever is greater;

    (c)   A term of supervised release of three years on Count One and a term of supervised release of one year on Count Two, which terms would run concurrently if both imposed, pursuant to 18 U.S.C. § 3624(c);

    (d)   A mandatory special assessment of $125 pursuant to 18 U.S.C. § 3013; and

    (e)   An order of restitution pursuant to 18 U.S.C. §§ 3663 and 3664, or as otherwise set forth in this plea agreement.

    4.   **SPECIAL ASSESSMENT.**  Prior to the entry of a plea pursuant to this plea agreement, Mr. Hughart will tender a check or money order to the Clerk of the United States District Court for $125, which check or money order shall indicate on its face the name of the defendant and the case number.  The sum received by the Clerk will be applied toward the special assessment imposed by the Court at sentencing. Mr. Hughart will obtain a receipt of payment from the Clerk and will tender a copy of such receipt to the United States, to be filed with the Court as an attachment to this plea agreement.  If Mr. Hughart fails to provide proof of payment of the special assessment prior to or at the plea proceeding, the United States will have the right to void this plea agreement.  In the event this plea agreement becomes void after payment of the special assessment, such sum shall be promptly returned to Mr. Hughart.

    5.   **PAYMENT OF MONETARY PENALTIES.**  Mr. Hughart agrees not to object to the Court ordering all monetary penalties (including the special assessment, fine, court costs, and any restitution that does not exceed the amount set forth in this plea agreement) to be due and payable in full immediately and subject to immediate enforcement by the United States.  So long as the monetary penalties are ordered to be due and payable in full immediately, Mr. Hughart further agrees

Defendant's
initals

Michael R. Whitt, Esquire
February 25, 2013                    Re: David C. Hughart
Page 3

not to object to the Court imposing any schedule of payments as merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment.

6.   **COOPERATION.**   Mr. Hughart will be forthright and truthful with this office and other law enforcement agencies with regard to all inquiries made pursuant to this agreement, and will give signed, sworn statements and grand jury and trial testimony upon request of the United States.   In complying with this provision, Mr. Hughart may have counsel present except when appearing before a grand jury. Further, Mr. Hughart agrees to be named as an unindicted co-conspirator and unindicted aider and abettor, as appropriate, in subsequent indictments or informations.

7.   **USE IMMUNITY.**   Unless this agreement becomes void due to a violation of any of its terms by Mr. Hughart, and except as expressly provided for elsewhere in this agreement, nothing contained in any statement or testimony provided by Mr. Hughart pursuant to this agreement, or any evidence developed therefrom, will be used against him, directly or indirectly, in any further criminal prosecutions or in determining the applicable guideline range under the Federal Sentencing Guidelines.

8.   **LIMITATIONS ON IMMUNITY.**   Nothing contained in this agreement restricts the use of information obtained by the United States from an independent, legitimate source, separate and apart from any information and testimony provided pursuant to this agreement, in determining the applicable guideline range or in prosecuting Mr. Hughart for any violations of federal or state laws. The United States reserves the right to prosecute Mr. Hughart for perjury or false statement if such a situation should occur pursuant to this agreement.

9.   **STIPULATION OF FACTS AND WAIVER OF FED. R. EVID. 410.**   The United States and Mr. Hughart stipulate and agree that the facts comprising the offenses of conviction include the facts outlined in the Stipulation of Facts, a copy of which is attached hereto as Plea

Defendant's
initals

Michael R. Whitt, Esquire
February 25, 2013                     Re: David C. Hughart
Page 4

Agreement Exhibit B.  The Stipulation of Facts does not necessarily
include all relevant conduct.

      Mr. Hughart agrees that if he withdraws from this agreement,
or this agreement is voided as a result of a breach of its terms by
Mr. Hughart, and he is subsequently tried on any of the charges in
the  Information,  the  United  States  may  use  and  introduce  the
Stipulation  of  Facts  in  the  United  States'  case-in-chief,  in
cross-examination of Mr. Hughart or of any of his witnesses, or in
rebuttal of any testimony introduced by Mr. Hughart or on his behalf.
Mr. Hughart knowingly and voluntarily waives, see United States v.
Mezzanatto, 513 U.S. 196 (1995), any right he has pursuant to Fed.
R. Evid. 410 that would prohibit such use of the Stipulation of Facts.
If the Court does not accept the plea agreement through no fault of
the defendant, or the Court declares the agreement void due to a
breach of its terms by the United States, the Stipulation of Facts
cannot be used by the United States.

      The United States and Mr. Hughart understand and acknowledge
that the Court is not bound by the Stipulation of Facts and that if
some or all of the Stipulation of Facts is not accepted by the Court,
the parties will not have the right to withdraw from the plea
agreement.

      10.  **AGREEMENT  ON  SENTENCING  GUIDELINES.**    Based  on  the
foregoing Stipulation of Facts, the United States and Mr. Hughart
agree that USSG § 2C1.1 applies to Count One and that Mr. Hughart's
base offense level with respect to Count One is 12.   The United States
and Mr. Hughart further agree that USSG § 2X5.2 applies to Count Two
and that Mr. Hughart's base offense level for Count Two is 6.

      The United States and Mr. Hughart acknowledge and understand
that the Court and the Probation Office are not bound by the parties'
calculation of the United States Sentencing Guidelines set forth
above and that the parties shall not have the right to withdraw from
the plea agreement due to a disagreement with the Court's calculation
of the appropriate guideline range.

                                        Defendant's
                                          initals

Michael R. Whitt, Esquire
February 25, 2013                    Re: David C. Hughart
Page 5

11.  **WAIVER OF APPEAL AND COLLATERAL ATTACK.**  Mr. Hughart
knowingly and voluntarily waives the right to seek appellate review
of any sentence of imprisonment or fine imposed by the Court, or the
manner in which the sentence was determined, on any ground whatsoever
including any ground set forth in 18 U.S.C. § 3742, so long as that
sentence of imprisonment or fine is within or below the Sentencing
Guidelines range corresponding to offense level 12.  The United
States also waives its right to seek appellate review of any sentence
of imprisonment or fine imposed by the Court, or the manner in which
the sentence was determined, on any ground whatsoever including any
ground set forth in 18 U.S.C. § 3742, so long as that sentence of
imprisonment or fine is within or above the Sentencing Guidelines
range corresponding to offense level 10.

Mr. Hughart also knowingly and voluntarily waives the right to
challenge his guilty plea and his conviction resulting from this plea
agreement, and any sentence imposed for the conviction, in any
collateral attack, including but not limited to a motion brought
under 28 U.S.C. § 2255.

The waivers noted above shall not apply to a post-conviction
collateral attack or direct appeal based on a claim of ineffective
assistance of counsel.

12.  **WAIVER OF FOIA AND PRIVACY RIGHT.**  Mr. Hughart knowingly
and voluntarily waives all rights, whether asserted directly or by
a representative, to request or receive from any department or agency
of the United States any records pertaining to the investigation or
prosecution of this case, including without any limitation any
records that may be sought under the Freedom of Information Act
(FOIA), 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a,
following final disposition.

13.  **FINAL DISPOSITION.** The matter of sentencing is within the
sole discretion of the Court. The United States has made no
representations or promises as to a specific sentence.  The United
States reserves the right to:

Defendant's
initals

Michael R. Whitt, Esquire
February 25, 2013                    Re: David C. Hughart
Page 6

- (a)  Inform the Probation Office and the Court of all relevant
       facts and conduct;

- (b)  Present evidence and argument relevant to the factors
       enumerated in 18 U.S.C. § 3553(a);

- (c)  Respond to questions raised by the Court;

- (d)  Correct inaccuracies or inadequacies in the presentence
       report;

- (e)  Respond to statements made to the Court by or on behalf
       of Mr. Hughart;

- (f)  Advise the Court concerning the nature and extent of Mr.
       Hughart's cooperation; and

- (g)  Address the Court regarding the issue of Mr. Hughart's
       acceptance of responsibility.

14. **VOIDING OF AGREEMENT.**  If either the United States or Mr.
Hughart violates the terms of this agreement, the other party will
have the right to void this agreement. If the Court refuses to accept
this agreement, it shall be void.

15. **ENTIRETY  OF  AGREEMENT.**  This  written  agreement
constitutes the entire agreement between the United States and Mr.
Hughart in this matter.  There are no agreements, understandings or
recommendations as to any other pending or future charges against
Mr. Hughart in any Court other than the United States District Court
for the Southern District of West Virginia.

Defendant's
initals

Michael R. Whitt, Esquire
February 25, 2013                          Re: David C. Hughart
Page 7


              Acknowledged and agreed to on behalf of the United States:

                              R. BOOTH GOODWIN II
                              United States Attorney


                        By: _____
                              STEVEN R. RUBY
                              Assistant United States Attorney


      SRR/vld

      I hereby acknowledge by my initials at the bottom of each of the
      foregoing pages and by my signature on the last page of this
      seven-page agreement that I have read and carefully discussed every
      part of it with my attorney, that I understand the terms of this
      agreement, and that I voluntarily agree to those terms and conditions
      set forth in the agreement.  I further acknowledge that my attorney
      has advised me of my rights, possible defenses, the Sentencing
      Guideline provisions, and the consequences of entering into this
      agreement, that no promises or inducements have been made to me other
      than those in this agreement, and that no one has threatened me or
      forced me in any way to enter into this agreement.  Finally, I am
      satisfied with the representation of my attorney in this matter.


      _____          _____2/27/13_____
      DAVID C. HUGHART                      Date Signed
      Defendant

      _____          _____2/27/13_____
      MICHAEL R. WHITT                      Date Signed
      Counsel for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY

UNITED STATES OF AMERICA

v.                              CRIMINAL NO._____
                                18 U.S.C. § 371
                                30 U.S.C. § 820(c)

DAVID C. HUGHART

I N F O R M A T I O N

The United States Attorney charges:

COUNT ONE

(Conspiracy to defraud the United States)

Background

At all relevant times:

1.   White Buck Coal Company ("White Buck"), a corporation, was registered with the federal Mine Safety and Health Administration (MSHA) as the operator of certain coal mines, including the White Buck #2 mine and the Grassy Creek #1 mine, and, beginning in or around 2008, the Hominy Creek mine (together, the "White Buck Mines" or the "Mines"). The White Buck Mines were located near Leivasy, Nicholas County, West Virginia. The products of the White Buck Mines entered commerce and the products and operations of the White Buck Mines affected interstate commerce. As such, White Buck, the White Buck Mines,

PLEA AGREEMENT EXHIBIT A

and persons employed at White Buck and the White Buck Mines were subject to the provisions of the Federal Mine Safety and Health Act of 1977 (the "Mine Act") and to the regulations promulgated thereunder. White Buck was a wholly owned subsidiary of Massey Energy Company ("Massey"). Massey, through other wholly owned subsidiaries, also owned and operated other coal mines at various places in the Southern District of West Virginia.

2. MSHA was an agency of the United States and of the United States Department of Labor (DOL), and was responsible for the enforcement of the Mine Act and the promulgation and enforcement of federal regulations related to mine safety and health, codified in Title 30 of the Code of Federal Regulations. These regulations included certain mandatory mine health and safety standards.

3. Among the mandatory mine health and safety standards promulgated and enforced by MSHA and applicable to the White Buck Mines and to other coal mines owned by Massey were the following:

a. In any part of a coal mine where coal was actively being extracted, an approved ventilation control device (typically specialized, heavy material called line brattice or line curtain, which is used to direct the flow of air in mines) had to extend to

2

within 10 feet, or some other distance prescribed by MSHA, of the deepest point of mine penetration. 30 C.F.R. § 75.330. This requirement is designed in part to ensure that enough air reaches the deepest point of mining to prevent dangerous buildups of explosive gases and dusts, as well as the inhalation of coal dust, a health hazard.

b.   Coal dust and loose coal fragments were required to be kept cleaned up and not allowed to accumulate. 30 C.F.R. § 75.400. This requirement was intended to prevent accumulations of combustible material that could fuel an explosion.

c.   Rock dust — incombustible, pulverized limestone spread in coal mines to prevent explosions — was required to be applied in most areas of a coal mine to within at least 40 feet, or some other distance prescribed by MSHA, of any working face.   30 C.F.R. § 75.402.   At every location where rock dust was required, at least 65% of the total dust present (rock dust, coal dust, and other dust) was required to be incombustible. 30 C.F.R. § 75.403. In certain areas of a coal mine, at least 80% of the total dust present was required to be incombustible. Id.

3

4.     As part of MSHA's regulatory and enforcement efforts, and pursuant to its statutory authority, MSHA mine inspectors made periodic, unannounced inspections of the White Buck Mines and other coal mines owned by Massey to ensure compliance with mine safety and health laws and to impose penalties for violations of those laws.   Violators were subject to civil and criminal penalties under the Mine Act. During these inspections, MSHA mine inspectors would and did issue citations, which penalized violations of mine health and safety laws but allowed the affected mine to continue operating, and orders, which were rarer than citations and which, in addition to penalizing a violation of mine safety and health laws, required the affected mine or a part of the affected mine to stop operating until the violation was corrected.    It was prohibited for any person to give advance warning of an MSHA inspection.

5.     Mine safety and health laws were routinely violated at the White Buck Mines and at other coal mines owned by Massey, in part because of a belief that consistently following those laws would decrease coal production.    These violations included violations of the mandatory mine health and safety standards described in paragraph 3.    If these routine mine health and safety violations were detected by MSHA, the resulting citations and orders could result in coal production being stopped until

4

the violations were corrected, in addition to civil monetary penalties as well as to criminal penalties including fines or imprisonment. Furthermore, the issuance of citations and orders by MSHA, particularly certain kinds of serious citations and orders, moved the affected mine closer to being classified as a mine with a pattern or potential pattern of violations. That classification would have resulted in increased scrutiny of the affected mine by MSHA, the issuance of additional serious citations and orders, and more frequent mandatory stoppages of coal production as a result of MSHA regulatory actions.

## The Defendant

6. Defendant DAVID C. HUGHART ("HUGHART") was President of Massey's Green Valley resource group during the period from at least in or around 2000 through in or around March 2010. The Green Valley resource group was an organizational unit of Massey that controlled the White Buck Mines. As President of the Green Valley resource group, HUGHART exercised control and authority over all aspects of the operations of the White Buck Mines. HUGHART also served as a director of White Buck from 2003 through 2010 or later.

## The Conspiracy

7. Beginning no later than in or around 2000 and continuing through and including around March 2010, at or near

Leivasy, Nicholas County, West Virginia, within the Southern District of West Virginia, and elsewhere within the Southern District of West Virginia, HUGHART, together with others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together with each other to defraud the United States and an agency thereof, to wit, to hamper, hinder, impair, impede, and obstruct by trickery, deceit, and dishonest means, the lawful and legitimate functions of DOL and its agency, MSHA, in the administration and enforcement of mine safety and health laws at the White Buck Mines and at other coal mines owned by Massey.

### Objects of the Conspiracy

8.    The objects and purposes of the conspiracy were to hamper, hinder, impair, impede, and obstruct the lawful government functions of DOL and MSHA in the administration and enforcement of mine safety and health laws at the White Buck Mines and at other coal mines owned by Massey.

### Manner and Means

9.    It was a part of this conspiracy that HUGHART, together with others known and unknown, would and did give and authorize and cause to be given to persons at the White Buck Mines and at other coal mines owned by Massey advance warning of MSHA inspection activities, knowing and intending that the

6

persons receiving this advance warning would conceal and cover up violations of mine safety and health laws that otherwise would result in citations and orders issued by MSHA.

10. It was further a part of this conspiracy that HUGHART, together with others known and unknown, upon receiving advance warning of MSHA inspection activities at the White Buck Mines and at other coal mines owned by Massey, would and did conceal and cover up, and authorize and cause the concealing and covering up of, violations of mine safety and health laws that otherwise would result in citations and orders issued by MSHA.

Overt Acts

11. In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of West Virginia:

a. On many occasions on various dates between around 2000 and around March 2010, HUGHART, together with others known and unknown, gave and authorized and caused to be given to persons at the White Buck Mines advance warning of MSHA inspection activities, knowing and intending that the persons receiving this advance warning would conceal and cover up violations of mine safety and health laws that otherwise would result in citations and orders issued by MSHA.

b.    On many occasions on various dates between around 2000 and around March 2010, HUGHART, together with others known and unknown, upon receiving advance warning of MSHA inspection activities at the White Buck Mines, concealed and covered up, and authorized and caused the concealing and covering up of, violations of mine safety and health laws that otherwise would result in citations and orders issued by MSHA.

In violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Conspiracy)

12.   The United States Attorney re-alleges paragraphs 1 through 11 as if fully set forth herein.

### The Conspiracy and Its Objects

13.   From in or about 2000 and continuing thereafter until about March 2010, at or near Leivasy, Nicholas County, West Virginia, within the Southern District of West Virginia, and elsewhere within the Southern District of West Virginia, HUGHART did conspire with others known and unknown to commit offenses against the United States in violation of 30 U.S.C. § 820(c), that is, knowingly conspired for directors, officers, and agents of known corporate operators of the White Buck Mines and other coal mines owned by Massey to knowingly authorize, order, and carry out violations of mandatory mine health and safety standards, which violations constituted violations of mandatory mine health and safety standards by known corporate operators of the White Buck Mines and other coal mines owned by Massey.

14.   Among the objects of the conspiracy was to violate and cause the violation of mandatory mine health and safety standards at the White Buck Mines and at other coal mines owned by Massey.

## Manner and Means

15.    It    was    a    part    of    this    conspiracy    that    HUGHART,
together    with    others    known    and    unknown,    would    and    did    knowingly
authorize,    order,    and    carry    out    violations    of    mandatory    mine
health    and    safety    standards    at    the    White    Buck    Mines    and    at    other
coal    mines    owned    by    Massey,    including    violations    of    the
mandatory    mine    health    and    safety    standards    described    above    in
paragraph 3.

## Overt Acts

16.    In    furtherance    of    the    conspiracy,    and    to    effect    the
illegal    objects    thereof,    on    many    occasions    and    various    dates
between    around    2000    and    around    March    2010,    at    or    near    Leivasy,
Nicholas    County,    West    Virginia,    within    the    Southern    District    of
West    Virginia,    HUGHART,    together    with    others    known    and    unknown,
did    knowingly    authorize,    order    and    carry    out    violations    of
mandatory    mine    health    and    safety    standards    at    the    White    Buck
Mines,    including    violations    of    the    mandatory    mine    health    and
safety    standards    described    above    in    paragraph    3.

In violation of Title 18, United States Code, Section 371, and Title 30, United States Code, Section 820(c).

UNITED STATES OF AMERICA

R. BOOTH GOODWIN II
United States Attorney

By: _____

STEVEN R. RUBY
Assistant United States Attorney

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.                                         CRIMINAL NO. 5:12-00220

DAVID C. HUGHART

### STIPULATION OF FACTS

The United States and David C. Hughart stipulate and agree that the facts comprising the offense of conviction for the two counts contained in the criminal Information attached to this plea agreement as Exhibit A include the following:

From at least approximately 2000 through approximately March 2010, White Buck Coal Company ("White Buck") was a corporation that owned and operated coal mines at or around Leivasy, Nicholas County, West Virginia, within the Southern District of West Virginia. White Buck was registered with the federal Mine Health and Safety Administration (MSHA) as the operator of mines including the White Buck #2 mine, the Grassy Creek #1 mine, and, beginning in or about 2008, the Hominy Creek mine (together, the "White Buck Mines" or the "Mines"). White Buck was a wholly owned subsidiary of Massey Energy Company ("Massey").

During the period from approximately 2000 through approximately March 2010, Mr. Hughart was President of Massey's Green Valley resource group. The Green Valley resource group was an organizational unit of Massey that controlled the White Buck Mines. As President of the Green Valley resource group, Mr. Hughart exercised control and authority over all aspects of the operations of the White Buck Mines and supervised scores of persons who worked at those Mines.

The products of the White Buck Mines entered commerce, and the products and operations of the White Buck Mines affected interstate commerce. The White Buck Mines and persons employed there were subject to the Federal Mine Health and Safety Act of 1977, as amended (the "Mine Act") and to the regulations promulgated thereunder, which were administered and enforced by MSHA.

Mr. Hughart and others employed at, or with supervisory authority over, the White Buck Mines understood that if violations of mine safety and health laws were detected, MSHA

**PLEA AGREEMENT EXHIBIT B**

would issue citations and orders that could result in coal production being stopped in one or more areas of the White Buck Mines and also could result in administrative monetary penalties or in criminal penalties including fines and imprisonment. Mr. Hughart and others employed at, or with supervisory authority over, the White Buck Mines also understood that MSHA's issuance of citations and orders moved the mine affected by a particular citation or order closer to being classified as a mine with a pattern or potential pattern of violations, which would result in increased scrutiny of that mine by MSHA, MSHA's issuance of additional serious citations and orders, and additional stoppages of coal production because of MSHA enforcement actions.

From at least approximately 2000 through approximately March 2010 Mr. Hughart and others employed at, or with supervisory authority over, the White Buck Mines and other mines owned by Massey combined and agreed to hinder and impede MSHA in administering and enforcing mine health and safety laws at the White Buck Mines and other mines owned by Massey. On many occasions between approximately 2000 and March 2010, Mr. Hughart or others employed at, or with supervisory authority over, the White Buck Mines gave advance warning to persons working underground at the White Buck Mines that MSHA inspection activities were about to occur at the White Buck Mines.

Also on many occasions between approximately 2000 and March 2010, Mr. Hughart and others employed at, or with supervisory authority over, the White Buck Mines, upon receiving advance warning of MSHA inspection activities at the White Buck Mines, concealed and covered up, and caused and authorized the concealing and covering up of, violations of mine health and safety laws that otherwise would result in citations and orders issued by MSHA. The violations concealed and covered up included failure to extend line curtain or other face ventilation controls to within the required distance of the deepest point of mining penetration in various areas of the Mines; excessive piles of coal dust and coal fragments; inadequate rock dust in various areas of the Mines.

Among the purposes of giving advance warning of MSHA inspections at the White Buck Mines and concealing and covering up violations of mine health and safety laws was to prevent MSHA from observing the Mines in the conditions under which they normally operated.

Throughout the period from approximately 2000 through approximately March 2010, Mr. Hughart and others employed at, or with supervisory authority over, the White Buck Mines and other mines owned by Massey knowingly combined and agreed for

2

directors, officers, and agents of known corporate operators of the White Buck Mines and other coal mines owned by Massey to knowingly authorize, order, and carry out violations of mandatory mine health and safety standards, which violations constituted violations of mandatory mine health and safety standards by known corporate operators of the White Buck Mines and other coal mines owned by Massey. On many occasions between approximately 2000 and approximately March 2010, Mr. Hughart and others employed at, or with supervisory authority over, the White Buck Mines did knowingly authorize, order and carry out violations of mandatory mine health and safety standards at the White Buck Mines, including violations of mandatory health and safety standards involving ventilation controls, accumulations of coal dust and loose coal, and rock dusting.

All of the above-described events occurred in or around Nicholas County, West Virginia, and in the Southern District of West Virginia.


Stipulated and agreed to:


_____                    2-28-13
DAVID C. HUGHART                                   Date
Defendant


_____                    2-28-13
MICHAEL WHITT                                      Date
Counsel for Defendant


_____                    2/28/13
STEVEN R. RUBY                                     Date
Assistant United States Attorney


3